IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TEAMSTERS LOCAL 237 WELFARE FUND; LOCAL 237 TEAMSTERS RETIREES' BENEFIT FUND; LOCAL 237 TEAMSTERS-PLAINVIEW-OLD BETHPAGE CENTRAL SCHOOL DISTRICT HEALTH AND WELFARE TRUST FUND; LOCAL 237 TEAMSTERS-NORTH BABYLON SCHOOL DISTRICT HEALTH AND WELFARE TRUST FUND; LOCAL 237 TEAMSTERS-BRENTWOOD SCHOOL DISTRICT HEALTH AND WELFARETRUST FUND; AND LOCAL 237 TEAMSTERS-SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION HEALTH AND WELFARE TRUST FUND, on behalf of themselves and all others similarly situated, | § § § § § § § § § § § § § § § § § § § | No. 415, 2015 |
| | | Court Below: Superior Court of the State of Delaware |
| | | C.A. No. N04C-11-191 |
| Plaintiffs Below, Appellants, | § § § § | |
| v. | § § § | |
| ASTRAZENECA PHARMACEUTICALS LP; AND ZENECA, INC., | § § § § | |
| Defendants Below, Appellees. | § § § § | |

Submitted: March 2, 2016
Decided: April 12, 2016

Before **HOLLAND**, **VALIHURA**, and **SEITZ**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

Uriel Rabinovitz, Esquire *(argued)*, Barbara J. Hart, Esquire, Scott V. Papp, Esquire, Lowey Dannenberg Cohen & Hart, P.C., White Plains, New York, Pamela S. Tikellis, Esquire, A. Zachary Naylor, Esquire, Tiffany J. Cramer, Esquire, Chimicles & Tikellis LLP, Wilmington, Delaware, Ellen Meriwether, Esquire, Bryan L. Clobes, Esquire, Cafferty Clobes Meriwether & Sprengel LLP, Philadelphia, Pennsylvania, L. Kendall Satterfield, Esquire, Finkelstein Thompson LLP, Washington, D.C., Robert S. Schachter, Esquire, Dan Drachler, Esquire, Zwerling, Schachter & Zwerling, LLP, New York, New York, Jeffrey L. Kodroff, Esquire, Spector Roseman Kodroff & Willis, PC, Philadelphia, Pennsylvania, for Plaintiffs Below, Appellants Teamsters Local 237 Welfare Fund.

Michael P. Kelly, Esquire *(argued)*, Daniel M. Silver, Esquire, McCarter & English LLP, Wilmington, Delaware, Jack B. Jacobs, Esquire, Sidley Austin LLP, Wilmington, Delaware, Mark E. Haddad, Esquire, Joshua E. Anderson, Esquire, David R. Carpenter, Esquire, Sidley Austin LLP, Los Angeles, California, for Defendants Below, Appellees AstraZeneca Pharmaceuticals LP, and Zeneca, Inc.

**SEITZ**, Justice:

## I. INTRODUCTION

A group of New York-based third party payor health insurers ("TPPs") that provide prescription drug benefits to union members appeal from a Superior Court judgment dismissing with prejudice their second amended complaint. At issue are claims brought by the TPPs under various state consumer fraud laws against AstraZeneca Pharmaceuticals LP, and Zeneca Inc. (collectively "AstraZeneca"). The TPPs allege that AstraZeneca falsely advertised its more expensive patented prescription drug Nexium as superior to the less expensive generic drug Prilosec, causing the TPPs to overpay for Nexium when generic Prilosec would have sufficed to treat their conditions.

After conducting an extensive choice of law analysis, the Superior Court determined that New York law controlled the TPPs' claims. The court then held that the TPPs failed to state a claim under New York's consumer fraud statute for failure to allege legally sufficient causation. According to the Superior Court, a physician's expertise in prescribing drugs for a patient's condition broke the causation chain between the advertising and the injury. The Superior Court denied leave to amend and dismissed the action with prejudice.

On appeal, the TPPs first focus on the Superior Court's choice of law analysis, and claim that Delaware law, not New York law, should govern their claims because Delaware has a closer connection to the claims. Second, the TPPs argue that the Superior Court erred in its causation analysis because the physician's decision to prescribe the higher-priced Nexium based on the allegedly false advertising, when lower-priced

Prilosec supposedly would do, directly injured them by forcing them to pay higher prescription drug costs.

After a careful review of the record on appeal, we affirm the ultimate judgment of the Superior Court. We need not decide whether the Superior Court correctly analyzed the choice of law issue, because under either state consumer fraud statute the TPPs cannot recover damages as a matter of law. Before recovering damages, both statutes require that the TPPs must be a victim of, or be injured "by reason of" or "as a result of" the allegedly false advertising. The TPPs cannot meet this standard of causation because any injury they suffered was self-inflicted. Obviously aware of the false advertising claims they brought in this litigation, the TPPs nonetheless continued to list Nexium on their formularies and continued to reimburse members for Nexium prescriptions during the many years this litigation was pending. Neither statute would recognize a consumer fraud claim to recover damages where a party claiming to be injured caused its own injury. Because the TPPs' claims fail as a matter of law, we affirm the Superior Court's dismissal of the amended complaint with prejudice.

## II. STATEMENT OF FACTS AND PROCEDURAL HISTORY

*The Facts Alleged in the Superior Court Second Amended Complaint*

Omeprazole is a chemical compound belonging to a class of proton-pump inhibitors ("PPIs") used to treat heartburn and erosion of the esophagus. AstraZeneca patented the chemical compound, which gave it a period of exclusivity to market and to sell the heartburn medicine free from competition by generic drug manufacturers. By the

4

year 2000, AstraZeneca's "purple pill" Prilosec, the trade name for omeprazole, was a top selling drug with annual sales of $6 billion.

The TPPs allege that in 2001 AstraZeneca faced a looming patent expiration deadline for Prilosec, meaning that generic competition was free to enter the market, severely affecting Prilosec's profitability. According to the TPPs, to combat the profit decline caused by generic competition, AstraZeneca introduced Nexium, a new patented PPI drug therapeutically identical to omeprazole but containing twice the amount of active ingredient. AstraZeneca marketed Nexium to doctors and the general public as superior to Prilosec in the hope that it would displace Prilosec in the PPI market. The TPPs alleged that the marketing campaign touting Nexium's superiority proved a resounding success, with Nexium achieving worldwide sales of $3.9 billion in 2012. The end result of AstraZeneca's false marketing campaign, say the TPPs, was "unlimited access to TPPs' treasuries, who paid billions of dollars for Nexium rather than the cheaper and therapeutically equivalent generic Prilosec."[1]

On November 18, 2004, the TPPs filed this action against AstraZeneca in the Superior Court on behalf of themselves and a putative nationwide class of TPPs. The action then slumbered under a stipulated stay while essentially identical consolidated class actions involving many of the same counsel but different plaintiffs proceeded in the United States District Court for the District of Delaware.

---

[1] Opening Br. at 7.

*The Federal Court Litigation*

On May 27, 2005, the plaintiffs in three federal cases filed a consolidated class action complaint on behalf of a nation-wide class of consumers and TPPs. Following a series of dismissals and appeals and a remand consuming half a decade,[2] the federal court plaintiffs filed an amended consolidated class action complaint in 2009, with counts for violations of the Delaware Consumer Fraud Act and the consumer fraud statutes of the other states, unjust enrichment, and negligent misrepresentation.

In a May 6, 2010 decision the District Court dismissed all of the plaintiffs' claims.[3] The District Court confronted complex choice of law issues where plaintiffs from diverse states sought relief under various theories of recovery, including under state consumer fraud statutes. As a first step in the choice of law analysis, the court evaluated whether an actual conflict existed among the many consumer fraud statutes raised in the litigation. Pertinent to the case before us, the District Court found an actual conflict between the New York and Delaware statutes.

According to the District Court, under New York law, "a plaintiff alleging a claim for deceptive advertising under [the consumer fraud statute] must plead some awareness of the advertising itself in order to state a claim."[4] By contrast, under Delaware law, "Delaware courts have found that a plaintiff can assert a cognizable claim under [the

---

[2] *Pa. Emp. Benefit Trust Fund v. Zeneca, Inc.*, 2005 WL 2993937 (D. Del. Nov. 8, 2005), *aff'd*, 499 F.3d 239 (3d Cir. 2007), *judgment vacated*, 556 U.S. 1101 (2009).
[3] *Pa. Emp., Benefit Trust Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458 (D. Del. 2010) [hereinafter "*Zeneca*"].
[4] *Id.* at 474.

Delaware Consumer Fraud Act] even where allegations of reliance are wholly lacking."[5] The conflict led the District Court to apply the "most significant relationship test" of the Restatement.[6] The District Court reviewed the various factors of the Restatement test and concluded that New York rather than Delaware law had the most significant relationship with the claims by one of the plaintiffs.

Applying New York law, the District Court discussed the "nuanced" relationship between reliance and causation under New York's consumer fraud statute. Although reliance is not a necessary element to state a claim under the statute, when it comes to causation and recovery of damages, a "plaintiff need not show that the defendant's misrepresentation was the sole impetus behind the decision to purchase a product, but the plaintiff cannot be wholly unaware of the misrepresentation prior to making the decision to purchase."[7] The plaintiffs argued that the defendant's misrepresentations caused the injury because patients paid an inflated price for what they thought was a superior product. But, as the District Court held, the argument presupposes that the plaintiffs were aware of the efficacy representations prior to purchasing Nexium, which was not pled in the amended complaint. Based on the lack of awareness, and as a consequence lack of causation, the District Court dismissed the plaintiffs' consumer fraud claim under New York law. The court also dismissed all other claims in the amended complaint, with

---

[5] *Id.*
[6] RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 145, 148 (1971).
[7] *Zeneca*, 710 F. Supp. 2d at 481.

leave to amend.  The plaintiffs chose not to amend their claims, and the dismissal became final.

*The Superior Court Action Resumes*

While the federal court litigation proceeded, the TPPs repeatedly requested, to no avail, that the Superior Court lift the stay.  The TPPs asked the court to lift the stay for the last time on August 16, 2010, after the District Court's judgment became final.  Due to an administrative error by the court, the case continued to languish until February 6, 2014, when the Superior Court finally lifted the stay.

The TPPs filed their second amended complaint in the Superior Court on April 10, 2014.  They alleged violations of the Delaware Consumer Fraud Act, violations of the consumer fraud laws of fourteen other states, unjust enrichment, and negligent misrepresentation.  Following AstraZeneca's unsuccessful attempt to remove the case to federal court, AstraZeneca moved to dismiss the second amended complaint.

The Superior Court granted AstraZeneca's motion.[8]  Relying on the District Court's choice of law analysis in *Zeneca*, the Superior Court found an actual conflict between the New York and Delaware consumer fraud statutes, conducted a choice of law analysis, and determined that New York law applied.  Applying New York law, the court found that the TPPs failed to state a claim.  According to the Superior Court, the "purported chain of causation that runs from the allegedly deceptive advertisements that may have influenced the decisions of individual doctors to prescribe a drug to their

---

[8] *Teamsters Local 237 Welfare Fund v. Astrazeneca Pharm. LP*, 2015 WL 4111826 (Del. Super. July 8, 2015).

8

patients to causally affect the payer unions in this case is simply too attenuated."[9]  The court reasoned that many factors affect a prescribing physician's decision to administer medication, and "doctors are presumed to go beyond advertising medium and use their independent knowledge in making medical decisions."[10]  The court also dismissed the TPPs' unjust enrichment claim for failure to plead causation, and their negligent misrepresentation claim for failure to plead reliance.  This appeal followed.  The TPPs have limited their claims on appeal to consumer fraud and the dismissal with prejudice.

## III.   ANALYSIS

*The Delaware and New York Consumer Fraud Statutes*

We focus our attention, as the parties did in this appeal, on the consumer fraud laws of Delaware and New York.  The Delaware General Assembly enacted a consumer fraud statute "to protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce in part or wholly within this State."[11]  Under the statute, "[a] private cause of action shall be available to any victim of a violation of this subchapter,"[12] where:

> [t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person

---

[9] *Id.* at *8.
[10] *Id.* (quoting *Se. Laborers Health & Welfare Fund v. Bayer Corp.*, 655 F. Supp. 2d 1270, 1281 (S.D. Fla. 2009), *aff'd*, 444 F. App'x 401 (11th Cir. 2011)).
[11] 6 *Del. C.* § 2512.
[12] *Id.* § 2525(a).

has in fact been misled, deceived or damaged thereby, is an unlawful practice.[13]

Accordingly, to bring a private cause of action for damages under the Delaware Act, a plaintiff must allege three elements: (1) a defendant engaged in conduct which violated the statute; (2) the plaintiff was a "victim" of the unlawful conduct; and (3) a causal relationship exists between the defendant's unlawful conduct and the plaintiff's ascertainable loss.[14] We have noted before the three ways in which the Delaware Consumer Fraud Act differs from traditional legal and equitable actions for fraud, misrepresentation, and deceit. First, "the only intent requirement of the Act is that in omitting or concealing a material fact, the defendant must have intended that others rely on the omission or concealment."[15] Second, "an unlawful practice . . . is committed regardless of actual reliance by the plaintiff."[16] And third, "any misrepresentation had to be made with the intent to induce action or inaction by the plaintiff[, but t]he statute does not require proof of such intent."[17] In all other respects, "the statute must be interpreted in light of established common law definitions and concepts of fraud and deceit."[18]

The New York State Legislature has enacted a similar consumer fraud law. Under its statute, "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful," and "any person who has been injured by reason of any violation of this section may

---

[13] *Id.* § 2513(a).
[14] *Id.* §§ 2513, 2525.
[15] *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).
[16] *Id.*
[17] *Id.*
[18] *Id.*

bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions."[19] To establish a violation of the New York statute, a plaintiff must prove "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act."[20] Like Delaware's Act, "[a] deceptive practice . . . need not reach the level of common-law fraud to be actionable [and] a plaintiff must prove 'actual' injury to recover under the statute, though not necessarily pecuniary harm."[21] Further, "reliance is not an element" of a New York Consumer Fraud Act claim.[22]

*Injury and Causation Under the New York and Delaware Consumer Fraud Laws*

Although neither statute requires that a plaintiff actually rely on the false advertising before stating a claim, both statutes require that the false advertising cause the plaintiff's injury.[23] The causation requirement is grounded in the language of each statute. In New York, the plaintiff must be injured "by reason of" a violation of the consumer fraud statute.[24] In Delaware, a private right of action is available to a "victim of a violation" of the Act.[25] Thus, the violation must have "caused" harm to the person

---

[19] N.Y. GEN. BUS. LAW § 349.
[20] *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000).
[21] *Id*. at 612.
[22] *Id*.
[23] 6 *Del. C.* § 2513(a) ("The act, use or employment by a person of any deception . . . *whether or not any person has in fact been misled* . . . is an unlawful practice.") (emphasis added); *Stutman*, 731 N.E.2d at 612 (recognizing that a plaintiff is not required to prove individual reliance upon a defendant's deceptive practice independently in order to state a claim under GBL 349).
[24] N.Y. GEN. BUS. LAW § 349(h); *Stutman*, 731 N.E.2d at 611.
[25] 6 *Del. C.* § 2525(a).

bringing the action for violation of the act, or the person would not be a "victim."[26] Additionally, the Delaware statute, when addressing damages where a receiver is involved, states that the injured party must suffer harm "as a result of" the fraudulent marketing activities.[27] Whether or not a receiver is involved, causation has also long been recognized as a requirement under the Delaware Consumer Fraud Act.[28]

The parties agree that the deceptive advertising must be the cause of the TPPs' injury, but disagree about what that means. The TPPs argue that they were the ultimate targets of AstraZeneca's alleged fraud because they paid for the purportedly overpriced prescriptions. Therefore TPPs, like consumers, allegedly suffered direct economic harm caused by AstraZeneca's misrepresentations when they overpaid for Nexium instead of the equally efficacious and less expensive Prilosec.[29] AstraZeneca responds that the TPPs do not allege they were exposed to the false advertising, and therefore the

---

[26] A "victim" is "a person harmed by a crime, tort, or other wrong." BLACK'S LAW DICTIONARY 1703 (9th ed. 2009).

[27] 6 *Del. C.* § 2524(c).

[28] *See Stephenson*, 462 A.2d at 1074 ("[Except for three specifically enumerated differences, the Delaware Consumer Fraud Act] must be interpreted in light of established common law definitions and concepts of fraud and deceit."); *id.* at 1077 ("A plaintiff . . . may recover for any injury resulting from the direct and natural consequences of his acting on the strength of the defendant's statements.").

[29] *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531 (3d Cir. 2004) (holding that TPPs "suffered direct economic harm" when they overpaid as a result of misrepresentations for a brand-name drug when an equivalent generic was available); *Desiano v. Warner Lambert Co.*, 326 F.3d 339, 349-50 (2d Cir. 2003) ("Consider . . . a hypothetical in which a defendant drug company markets a 'new,' much more expensive drug claiming it is a great advancement . . . when in fact the company is simply replicating [an old] formula and putting a new label on it. [T]he insurance companies would be able to claim—precisely as they do here—that the defendants engaged in a scheme to defraud it, and that the company suffered direct economic losses as a result.").

12

advertising could not have caused their injury.[30] Further, AstraZeneca argues that even if the TPPs were exposed to the advertising, the allegedly false advertising did not cause the TPPs' injury because other events intervened to make the connection between the advertising and the harm too attenuated. For instance, like the Superior Court, AstraZeneca points to the physician's professional decision to prescribe the drug—which is presumed to be made in the best interests of the patient—as a break in the causation chain.[31]

---

[30] *See Gale v. Int'l Bus. Machs. Corp.*, 781 N.Y.S.2d 45, 47 (N.Y. App. Div. 2004) (a plaintiff must at a minimum be aware of the false statements to plead causation with sufficient specificity).

[31] *See McDowell v. Eli Lilly & Co.*, 58 F. Supp. 3d 391, 410-11 (S.D.N.Y. 2014) (holding consumer fraud claims were defeated by adequate warning and failure to show proximate cause by operation of the learned intermediary doctrine); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 255-56 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004) ("[T]o prove their . . . consumer fraud claims, plaintiffs would . . . have to show these activities caused harm to consumers and TPPs. [T]he learned intermediary doctrine presents a barrier to proving that any deceptive representations made by defendant were the proximate cause of plaintiffs' injuries."); *see also UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 134 (2d Cir. 2010) (internal citations omitted):

> The TPP plaintiffs draw a chain of causation in which Lilly distributes misinformation about [the drug], physicians rely upon that misinformation and prescribe [it] for their patients, and then the TPPs overpay. This narrative skips several steps and obscures the more attenuated link between the alleged misrepresentations made to doctors and the ultimate injury to the TPPs. In fact, . . . the chain of causation runs as follows: Lilly distributes misinformation about [the drug], physicians rely upon the misinformation and prescribe [it], TPPs relying on the advice of [pharmacy benefit managers to] place [the drug] on their formularies . . . , TPPs fail to negotiate the price . . . below the level set by Lilly, and TPPs overpay . . . . Thus, in this case "the conduct directly causing the harm was distinct from the conduct giving rise to the fraud." Plaintiffs' "theory of liability rests on the independent actions of third and even fourth parties . . . ."

13

To decide this appeal we need not engage in the lively debate about the scope of causation and its interplay with state consumer fraud statutes.[32]  Instead, we rely on the common sense notion that TPPs who claim that false advertising injured them, but continue to cover the allegedly falsely advertised drug on their formularies and reimburse members for prescriptions cannot, as a matter of law, establish that they were "injured by reason of" or were victims of the false advertising.

The parties agree that under either the Delaware or the New York consumer fraud statutes, the plaintiff must be a victim of or be injured by the allegedly false advertising before damages can be recovered.  Despite alleging in their 2004 complaint that AstraZeneca falsely advertised Nexium as superior to Prilosec, the TPPs concede that they continued to list Nexium on their formularies and to pay or reimburse their members for Nexium.[33]  Under any reasonable interpretation of the statutes, TPPs who continue to

---

[32] *See, e.g.*, James D. Arden & Peter C. Brensilver, *A Bitter Pill for Plaintiffs: Obstacles to Market Theories of Causation in Prescription Drug Consumer Fraud Cases*, 61 FOOD & DRUG L.J. 539 (2006) (discussing the emergence of market theories of causation in the consumer fraud-pharmaceutical context); Joseph J. Leghorn et al., *Defending an Emerging Threat: Consumer Fraud Class Action Suits in Pharmaceutical and Medical Device Products-Based Litigation*, 61 FOOD & DRUG L.J. 519, 535 (2006) ("Despite the elimination or relaxation of other elements of a typical common law fraud claim, nearly all of the states still require . . . a 'causal nexus' between unfair or deceptive conduct and the plaintiff's injury.  On its face, this principle seems counter-intuitive—particularly in jurisdictions where plaintiffs need not demonstrate reliance . . . . Courts have struggled to craft standards that address this apparent paradox."); Sheila B. Scheuerman, *The Consumer Fraud Class Action: Reining in Abuse by Requiring Plaintiffs to Allege Reliance as an Essential Element*, 43 HARV. J. ON LEGIS. 1 (2006).  *See generally* Henry N. Butler & Jason S. Johnston, *Reforming State Consumer Protection Liability: An Economic Approach*, 2010 COLUM. BUS. L. REV. 1 (2010) (discussing the functioning of consumer protection laws and suggesting changes).

[33] The TPPs allege that the proposed "Class" is composed of purchasers of Nexium during the Class Period, which extended to March 25, 2010.  The TPPs admitted at oral argument that they continue to pay for Nexium, years after they came to believe it was a fraudulent product.

pay or reimburse for Nexium, while claiming they were harmed by allegedly false advertising, are neither "victims" of the allegedly false advertising nor were they injured by reason of or as a result of it. They were injured by their own conduct.[34]

The TPPs nonetheless claim that they were directly injured by the false advertising, even though they believed the advertising was false and misleading, because they were forced to pay a higher price for Nexium rather than the "market" price reflecting its true value. In other words, the TPPs would have paid a lower "market" price if all participants had been fully informed about the alleged equivalence of Nexium and Prilosec. But the TPPs' fraud-on-the-market theory has been rejected by other courts

---

Videotape: Oral Argument before the Delaware Supreme Court, at 7:03-8:10 (*Teamsters Local 237 Welfare Fund v. AstraZeneca Pharm. LP*, 415, 2015 (Del. Mar. 2, 2016)) ("Q: But once you discovered . . . that Nexium was a 'fraudulent product,' I assume you immediately stopped paying for it[?] A: No, your honor."), *archived at* http://livestream.com/DelawareSupremeCourt/events/4901943/videos/114082603.

[34] *See Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329, 1336 (S.D.N.Y. 2007) (under the Florida and New York consumer fraud laws, plaintiffs who continued to pay for Lipitor with knowledge of its alleged limitations were not "actually injured or aggrieved" by the allegedly misleading advertisement); *Heindel v. Pfizer, Inc.*, 381 F. Supp. 2d 364, 379 (D.N.J. 2004) (plaintiffs did not suffer ascertainable economic loss because of their continued use of the drugs in question while claiming a failure to disclose known risks). The TPPs claim that the Third Circuit's recent decision in *In re Avandia Marketing, Sales Practices & Product Liability Litigation*, 804 F.3d 633 (3d Cir. 2015), is to the contrary. But in *Avandia* the court rejected a similar claim because the defendant "first asks us to assume, in the absence of contrary allegations, that plaintiffs did not change their coverage of Avandia in 2007. At this stage, however, we do not know that this is true." *Id.* at 644. In the case before us, we know it to be true that the TPPs continued to list Nexium on their formularies and to pay for or reimburse members for Nexium purchases. The *Avandia* court also rejected the same argument because at the pleading stage it was not clear that the full scope of the drug's risks was known in 2007. Here, we do not address an information void on side effects or risk profiles. Instead, the "full scope of the alleged fraud" was apparent from the complaint, and the TPPs could have chosen to remove Nexium from their formularies based on their claims.

as speculative because it does not represent the realities of the pharmaceutical market.[35]

No "market" in the traditional economic sense exists to set a price for prescription drugs—pharmaceutical companies set prices in a heavily regulated environment with little interplay between the laws of supply and demand.[36] Further, even if market forces set prescription drug prices, the TPPs elected to continue covering Nexium fully aware of their false advertising claims. To recognize a fraud on the market theory in the present context would ignore the TPPs culpability for their self-inflicted wound.

Finally, the TPPs argue that they were "forced" to cover Nexium because of the overwhelming advertising pressure exerted by AstraZeneca directed towards physicians and patients. Their argument is particularly unpersuasive given the role of TPPs in the healthcare system, a large part of which is cost control.[37] TPPs are structured to counter

---

[35] *E.g.*, *Prohias*, 485 F. Supp. 2d at 1337 ("I . . . reject the plaintiffs' claim that they have been injured by 'price inflation' because . . . [t]hey depend on the faulty premise that the price of [drugs fluctuate] based on the public's knowledge of [their] benefits, even though drug prices (unlike stock prices which are necessarily set by the price at which buyers are willing to buy, or sellers willing to sell) are fixed by the product's manufacturer."); *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*, 929 A.2d 1076, 1088 (N.J. 2007) ("[T]he fraud on the market theory [is] inappropriate in any context other than federal securities fraud litigation. Therefore, to the extent that plaintiff seeks to prove only that the price charged for [the drug] was higher than it should have been as a result of defendant's fraudulent marketing campaign, . . . the theory must fail."); *Heindel*, 381 F. Supp. 2d at 380 ("[The fraud-on-the-market theory in the pharmaceutical context] is patently absurd. . . . [T]here is no prescription drug 'market,' at least as that term is understood in the securities context.").

[36] *See* Arden & Brensilver, *supra* note 32, at 542 ("The fraud-on-the-market theory presumes the existence of an 'impersonal, well-developed' market for the product. . . . In the securities context, the presumption is that any material misrepresentations will lead to an artificially inflated price because a security is price-sensitive to all public information. In contrast, a prescription drug is not constantly re-priced on the basis of the current mix of information in the market, as there is no strong correlation between the price and the demand for the product." (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988))).

[37] As the Third Circuit observed in *Avandia*:

16

pharmaceutical company pressure on physicians and patients to prescribe and to use more expensive branded drugs where generics will do. TPPs can incent physician and patient behavior by not listing a drug on their formularies, or by offering financial incentives to use less expensive and equally effective generic medicines. The TPPs chose not to do so here while fully aware of their false advertising claims. That was their business decision to make. But they cannot then recover damages under either consumer fraud statute for the harm they inflicted on themselves.

*Dismissal with Prejudice*

Given the basis for our disposition of this appeal, leave to amend in the Superior Court would have been futile.[38] Therefore, we affirm the Superior Court's dismissal of this action with prejudice.

---

> Whether a TPP will cover the cost of a member's prescription, in whole or in part, depends on whether that drug is listed in the TPP's "formulary." Pharmacy Benefit Managers (PBMs) prepare TPPs' formularies of drugs approved for use by the TPPs' members. The formularies are prepared by analyzing research regarding a drug's cost effectiveness, safety and efficacy. When a PBM determines that a drug offers advantages over a competing drug, it will give that drug preferred status on the formulary. A TPP will typically cover more of the cost of a particular drug when that drug has a higher preference status on the formulary. The greater coverage of cost by the TPP allows the member to pay a lower co-payment when prescribed that drug.

804 F.3d at 634-35; *see also UFCW Local 1776*, 620 F.3d at 126, 134 ("[O]nly the TPPs were in a position to negotiate the price paid for [the drug.]").

[38] *See Clark v. State Farm Mut. Auto. Ins. Co.*, -- A.3d --, 2016 WL 125432, at *7 (Del. Jan. 11, 2016).